IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JACOB APELBAUM,

                Plaintiff,

   v.

NETWORKED INSIGHTS, INC.
and DAN NEELY,

                Defendants.

OPINION AND ORDER

10-cv-50-wmc

For less than five months, between April 27, 2009 and September 11, 2009, plaintiff Jacob Apelbaum was employed as defendant Networked Insights, Inc.'s Vice President of Technology. In that role, Apelbaum was a member of Networked Insights' leadership team headed by the other defendant, Dan Neely, the company's C.E.O. The fallout of the parties' short, disastrous relationship is this lawsuit. For the reasons set forth below, it appears a trial will be necessary to ferret out the facts here.

Apelbaum's complaint originally involved three claims -- (1) breach of contract against Networked Insights for failure to honor stock options and pay an "early delivery" and semi-annual bonuses; (2) civil theft pursuant to Wis. Stat. § 895.446 against Networked Insights and Neely; and (3) conversion against Networked Insights and Neely.[1] (Dkt. #1.) The parties have since settled the latter two claims both involving a

---

[1] Apelbaum filed his lawsuit in Wisconsin state court. Networked Insights properly removed the case. The court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. The parties are diverse and the amount in controversy exceeds $75,000. Apelbaum is a citizen of New York. Networked Insights is a Wisconsin corporation with its principal place of business located in Madison, Wisconsin.

laptop computer.[2]  Defendant Networked Insights filed counterclaims, also for civil theft and conversion involving a different laptop computer.

Now before the court are two motions, brought by Networked Insights:  the first for summary judgment on Apelbaum's breach of contract claim and the second for default judgment as a discovery sanction because of alleged spoliation of evidence.  The court grants Networked Insights' motion for summary judgment with respect to the stock options and semi-annual bonus provisions in the contract, but denies summary judgment with respect to Apelbaum's claim for failure to pay the early delivery bonus.  The court will also reserve judgment on Networked Insights' motion for discovery sanctions at this time given the insufficient proof of spoliation of material evidence.  The court will, however, allow Networked Insights to present additional evidence on this issue at trial, including recently disclosed evidence with respect to alteration of information on Apelbaum's cell phone, and will decide this motion at the close of trial.

UNDISPUTED FACTS[3]

### 1.  SocialSense 2.0

Before hiring Apelbaum, Networked Insights retained a consultant, John Purrier, to help Networked Insights develop a plan and a timeline for creating SocialSense 2.0, a

---

[2]  Apelbaum filed a motion for entry of partial judgment on these claims pursuant to Federal Rule of Civil Procedure 68(a).  (Dkt. #81.)  Defendants oppose entry at this time.  Given the short time to trial, the court will withhold entry of any judgment until all claims are resolved.

[3]  The court finds the following facts taken from the parties proposed findings of fact to be material and undisputed.

new generation of Networked Insights' main product, SocialSense. SocialSense is a data platform, which is composed of both software and hardware, all of which are managed by Networked Insights. Networked Insights operates the data platform and sells access to the resulting data and analysis to its clients.

Purrier issued a report (the "Purrier Report"), which Apelbaum admits operated as a "gauge, the barometer of success" for the development of SocialSense 2.0. (Deposition of Jacob Apelbaum ("Apelbaum Dep.") (dkt. #68) 195:7-14.) The Purrier Report identified October 31, 2009 as a reasonable date to complete the development of SocialSense 2.0.

Purrier recommended that Networked Insights pursue a "grid infrastructure" such as "Hadoop and associated technologies." (Declaration of Brian D. Johnson ("Johnson Decl."), Ex. E (dkt. #44-5) 3.) Hadoop would provide an alternative arrangement to Networked Insights historical practice -- of using a small number of large expensive servers to power its data platform -- by linking together a large number of smaller inexpensive computers to simultaneously analyze and access large volumes of data. Adopting this alternative arrangement would have certain advantages including speed, reliability, processing power, and scalability.

### 2. Apelbaum's Written Employment Contract

On April 1, 2009, Apelbaum and Networked Insights entered into a written employment contract that set forth the terms of Apelbaum's compensation.[4] Three

---

[4] Apelbaum contends that the terms of the contract were modified by subsequent oral

compensation provisions of the April 1, 2009 written employment contract form the basis of the dispute concerning Apelbaum's breach of contract claim: (1) the semi-annual bonuses; (2) the early delivery of SocialSense 2.0 bonus; and (3) the stock options award.

The contract provides in pertinent part:

### SALARY & BONUSES

- Your salary will be $130,000 annually, which will be paid semi-monthly. Contingent on the close of the next major round of financing ($\geq$$5MM), you will be eligible for an increase in your annual salary to $135,000 or more commensurate with your contributions to the company.

- You are eligible for semi-annual bonuses with a 15% target. Each of these bonuses will be paid out between 0% and 200% of the target based on your individual success and company performance. With your participation on the leadership team, 75% of your multiplier will be based on company performance. The first bonus payout will occur in July 2009. The first bonus will be pro-rated based on your start date and the bonus period start date of January 1, 2009. The second bonus payout will occur in January 2010.

- You are eligible to receive a bonus for successfully leading the development and early delivery of version 2.0 of our SocialSense application. A $5,000 bonus will be awarded for each month prior to October 2009 that the application is fully launched against an existing or new client.

### EQUITY

- You will be entitled to 50,000 options which will vest over a period of 3 years.

- The exercise price will be determined as [sic] at the next meeting of the Board of Directors, tentatively

---

agreements, which the court addresses below.

> scheduled for April 23, 2009. The above options are
> subject to the 2007 Stock Option Plan.

(Johnson Decl., Ex. A (dkt. #44-1).)

### 3. Apelbaum's Employment

Apelbaum began working for Networked Insights in late April 2009. Networked Insights contends that shortly after the start of Apelbaum's employment, he began to engage in conflicts with his colleagues, including acting aggressively, raising his voice, and swearing. Apelbaum disputes some of Networked Insights' characterizations of his actions, but admits that during one confrontation, for example, Apelbaum stood up, slammed his hands down on the table, and leaned into the Vice President of Product Strategy Matt Wulff's face, calling him a child and suggesting that he "put on his fucking diaper." (Def.'s PFOFs (dkt. #39) ¶ 12.)

Nevertheless, as Vice President of Technology, Apelbaum continued to be charged with successfully leading the development and delivery of SocialSense 2.0. Indeed, as described above, Apelbaum's April 1, 2009 written employment contract with Networked Insights provided a bonus for its early delivery.

Apelbaum testified at his deposition that as part of developing SocialSense 2.0, he committed to "actually adding additional functionality such as Hadoop processing" to SocialSense 2.0. (Apelbaum Dep. 195:7-23, 207:1-14.) Apelbaum also testified at his

deposition that the move to Hadoop "began in the sprint[5] and was executed shortly afterwards." (Apelbaum Dep. 257:3-5.)

An August 10, 2009 email from Apelbaum to Wulff described the Hadoop migration as having begun but not been completed. It reads in relevant part:

> [T]he engineering team is currently aggressively working on the following items:
>
> . . .
>
> 2. Analytics to Hadoop job migration (to be completed in three phases (1) job optimization-this is done (2) manual Hadoop execution (3) automated Hadoop job execution)
>
> . . .
>
> We are currently concentrating our efforts on the Hadoop related activities (items 2-5) and plan to have base functionality in place within the next 8-12 weeks.

(Declaration of Matthew E. Wulff ("Wulff Decl."), Ex. A (dkt. #45-1).)

In an email concerning a sale of data generated by SocialSense 2.0 in July 2009, Apelbaum himself cautioned:

> Keep in mind that even though we are using Hadoop to solve an urgent production issue (our back was against the wall!), this is still only a proof of concept and will require significant amount of work in terms of architecture and development before we have a fully automated distribution processing solution.

(Second Declaration of Brian D. Johnson, Ex. A (dkt. #78-1).)

Apelbaum testified at his deposition that he delivered SocialSense 2.0 on or before June 1, 2009. In an internal "Wiki" (an internal information repository), Networked

---

[5] Networked Insights undertook an intense period of work on SocialSense 2.0 known as the "sprint," which ended on June 26, 2009.

Insights indicates that June 26, 2009 marked the release date of SocialSense 2.0.[6]  On

July 21, 2009, Matt Wulff stated on Networked Insights' blog that:

> Big things have been happening behind the scenes at
> Networked Insights.  A little over a month ago our
> development went into seclusion.  They were tasked with
> fast-tracking a series of changes to version 1.0 of our
> SocialSense application.  The result of this monumental effort
> is version 2.0 of SocialSense.  On June 26, development was
> completed on the second version of our flagship application.

(Affidavit of Dixon Gahnz ("Gahnz Aff."), Ex. D (dkt. #65-2).)   On July 27, 2009,

Networked Insights issued a press release that announced "the release of its next-

generation social media listening platform, SocialSense 2.0."  (*Id.*, Ex. E (dkt. #65-3).)[7]

---

[6] Johnson testified at his deposition, however, that SocialSense 2.0 was not formally made available to clients on June 26, 2009.  "It ended up--at the time that's what it would have meant.  It's suffice to say that we learned eventually that the product was not complete."  (Affidavit of Dixon Gahnz, Ex. B (Johnson Dep.) (dkt. #69) 62:7-63:3.)

[7] Networked Insights contends that this exhibit and others attached to Attorney Gahnz's affidavit -- Exhibits F, H, I and Q -- should be stricken because he lacks personal knowledge necessary to authenticate them.  While the court discourages the practice of attorneys attempting to authenticate documents by averring they were produced to them in discovery, the court will consider the documents here.  Networked Insights does not dispute that all but one of the proposed exhibits -- the July 27, 2009 press release -- were produced in response to Apelbaum's specific discovery requests, nor that they are fugitive documents which inexplicably found their way into Networked Insights' possession or are suspect on their face.  If Networked Insights has a legitimate basis to object to the authenticity of any of these documents at trial, Apelbaum will, of course, need to authenticate them.  As for the press release, Networked Insights does not contend either that the press release was not actually released or that it was somehow concocted. In fact, the press release can be found on Networked Insights' website (http://networkedinsights.com/news/media/downloads/releases/2009_0727_ni_socialsense V2.pdf).  Lawyers submit personal affidavits on summary judgment at their peril.  Here, it would certainly have been better for Apelbaum himself to submit this exhibit by affidavit, since it was presumably produced from his files, received by him contemporaneously with its release or, at least, within his capacity to authenticate, but the court will consider it for purposes of deciding summary judgment.  Unlike *Adusumilli v. City of Chicago*, 164 F.3d 353 (7th Cir. 1998), where the affiant made a representation

On June 12, 2009, Networked Insights entered into an agreement with Tribal DDB for Tribal DDB's evaluation of "the Application." (Gahnz Aff., Ex. F (dkt. #65-4).) The document itself does not mention SocialSense 2.0 specifically, but rather just generally discusses the SocialSense application. A client launch calendar from 2009 indicates that "McDonald's," which was the name of this project, was launched on July 7, 2009. (*Id.*, Ex. C (dkt. #65-1).) On June 27, 2009, Networked Insights entered into a Master Services Agreement for SocialSense 2.0 with American Family Insurance Company. (*Id.*, Ex. H (dkt. #65-6).) Like the contract with Tribal DDB, this agreement also does not specifically reference version 2.0 of SocialSense. Beginning in July 2009, Networked Insights received $15,000 in revenue from American Family for a three-month trial of SocialSense. (*Id.*, Ex. J (dkt. #65-8).) Networked Insights recognized revenue from three other companies as of September 2009. (*Id.*)

On July 29, 2009, Neely circulated a company-wide email stating in part:

> I wanted to recap Friday [July 26, 2009] for those that were not present. We had an amazing push for the mother of all sprints, while there is still some work to be done we achieved a massive amount of work and delivered tons of value over the last 4 weeks.

(Gahnz Aff., Ex. I (dkt. #65-7).) Also, sometime in the summer of 2009, Networked Insights threw a party celebrating the development of SocialSense 2.0, though the parties dispute what milestone exactly was being celebrating.

---

obviously beyond her knowledge, Apelbaum can correct any deficiencies with Attorney Gahnz's affidavit at trial.

### 4.  Stock Options / Stock Award

Apelbaum's written employment contract provided for an equity award.   The award, vesting, exercise and revocation of Networked Insights' stock options are governed by two documents: (1) the Networked Insights, Inc. 2007 Stock Incentive Plan, ("the Plan") and (2) the Employee Stock Options Award.   The Plan gives the Board of Directors the authority to award stock options, to set the terms and condition of such awards, and to administer the Plan.   After the Board awards stock options to an employee, Networked Insights sets forth the terms and conditions governing those stock options in a document called an Employee Stock Option Award.   The Employee Stock Options Award is a form document; the terms of a specific award are not negotiated on an employee-by-employee basis.

Networked Insights issued an Employee Stock Option Award (the "Award") to Apelbaum on August 27, 2009, which provided in pertinent part:

> You have been granted the option (the "Option") to purchase shares of common stock of Networked Insights, Inc. (the "Company") under the Networked, Insights, Inc. 2007 Stock Incentive Plan (the "Plan") with the following terms and conditions:
>
> Number of Option Shares:          50,000
>
> Exercise Price per Share:          U.S. $2.20

(Johnson Decl., Ex. C (dkt. #44-4).)

Under the terms of the Award, stock options "vest and become exercisable, provided" Apelbaum is "employed by the Company or its Subsidiaries" on the following vesting dates:

- 25% of the Option Shares will vest on the 1st anniversary of the Grant date;

- An additional 25% of the Option Shares will vest in equal monthly installments on the last day of the calendar month for 12 months thereafter; and

- The remaining 50% of the Option Shares will vest in equal monthly installments on the last day of the calendar month for 12 months thereafter.

(*Id.*)  Specifically, the terms of the Award provide:

> You may exercise this Option only to the extent vested and only if the Option has not expired or terminated.  To exercise this Option, you must complete: (i) the "Noted of Stock Option Exercise" form provided by the Company; (ii) the "Investment Representation Statement" form provided by the Company; and (iii) an Adoption agreement to the Stockholders' Agreement, if applicable, in the form provided by the Company and return all the documents to the Company at the address indicated on the Notice of Stock Option Exercise form.  The form will be effective when it is received by the Company.

(*Id.*)  Apelbaum never provided an executed Notice of Stock Option Exercise form, Investment Representation Statement form or an Adoption Agreement to Networked Insights.

The Award also defines the revocation of stock options upon the employee's termination depending on whether the employee is terminated "for any reason other than Cause" or "for Cause":

> If the employment or service with the Company and its affiliates terminates for any reason other than Cause, any and all unvested Option terminate immediately and your vested Options will terminate on the close of business at the Company's headquarters on the 90th day following the date of your termination of employment or service.

10

> If your employment of service is terminated for Cause, your entire Option (whether vested or unvested) is terminated immediately.  In addition, if you have submitted a notice of exercise that has not yet been processed and you are terminated for Cause, your notice of exercise will be rescinded and your exercise price will be returned to you.

(*Id.*)  "For Cause" is defined in the Plan as:

> "Cause" means any of the following: (i) the Participant's conviction of a felony (or plea of *nolo contrendre* thereto); (ii) the Participant's willful refusal to substantially perform his duties as an employee, director or consultant (other than as a result of disability or illness or an absence approved by the Company); (iii) the Participant's willful engagement in misconduct that is materially injurious to the Company or an Affiliate; (iv) the Participant's violation of any material policy or code of conduct of the Company or an Affiliate; or (v) the Participant's violation of the provisions of any employment agreement, non-competition agreement, confidentiality agreement, assignment of inventions agreement, or any similar agreement with the Company or an Affiliate, in each case as determined by the Board.

(*Id.*)

Apelbaum does not dispute that he received the August 27, 2009 Award or the terms as outlined above.  Instead, he contends that CEO Dan Neely converted the stock options award to an outright award of stock, valued at over $100,000, to be awarded upon the successful release of SocialSense 2.0 and its commercial realization.  Networked Insights and Neely dispute Apelbaum's theory.

### 5. Apelbaum's Termination

Apelbaum's employment with Networked Insights was terminated on September 11, 2009. In a letter dated that same day, Neely explained the reasons for the termination:

> You are being terminated for, among other reasons, acting aggressive [sic] and causing others to be physically and verbally intimidated by you at work, yelling at another member of the management team in an open area such that a non-management employee was offended and described you as being indecent, causing others to recently resign from Networked Insights because they could not tolerate working with you any longer, lack of support for customer priorities, and fracturing the Networked Insights' management team into near mutiny while I was out of the office last week.

(Johnson Decl., Ex. B (dkt. #44-2).)[8]

### 6. "Award" of Semi-Annual Bonuses for 2009

During Apelbaum's employment with Networked Insights, the Leadership Team at Networked Insights consisted of Dan Neely, Brian Johnson, Jacob Apelbaum and Todd Hoskins. The April 1, 2009 contract specified that discretionary, semi-annual bonuses would be paid to members of this team between 0% and 200% of a defined "target" amount. Seventy-five percent of the discretionary semi-annual bonus was directly tied to company performance. The remaining twenty-five percent was not attributed to any specific factor. The contract also allowed the Board to select a semi-annual bonus amount for Apelbaum between 0% and 200% of the target.

---

[8]  The parties dispute whether this termination was "for cause" as defined in the 2007 Stock Incentive Plan.

Networked Insights' Board met in February 2010 to consider whether to award semi-annual bonuses to the Leadership Team.  In deciding whether to award 2009 semi-annual bonuses, the Board focused mainly on whether Networked Insights achieved its 2009 financial goals.  One of its principal goals was to cover "all of its expenses through revenues gained from selling products," that is, to break even.   After reviewing a wide array of financial factors, including that it lost money in 2009, the Board determined that no member of the management team would receive a discretionary bonus for either the first half or the second half of 2009.  In other words, the board opted to "award" 0% of the target bonus amount.[9]

OPINION

A.      **Motion for Partial Summary Judgment**

        **1.  Stock Options**

Under the terms of the April 1, 2009 employment contract, Apelbaum's August 27, 2009 Stock Options Award and the 2007 Stock Incentive Plan foreclose Apelbaum's breach of contract claim with respect to his putative stock options.  The Award granted 50,000 options at an exercise price of $2.20 per share.  The Award also provided a schedule in which the options vested over a three-year period, with the first vesting date to occur on August 27, 2010 -- the first anniversary of the date on which the Award was granted.   The Award is entirely consistent with the equity provision in Apelbaum's

---

[9] Like the stock option issue, Apelbaum contends that the bonus structure was modified by a subsequent oral agreement with Neely, although his deposition testimony is inconsistent as to the exact nature of the modification.  There is, nevertheless, some evidence in the record that the management team was at least contemplating a change in the salary/bonus structure.  (Gahnz Aff., Ex. Q (dkt. #65-14).)

employment contract which provided that he "will be entitled to 50,000 options which will vest over a period of 3 years" and that "[t]he exercise price will be determined [] at the next meeting of the Board of Directors." (Johnson Decl., Ex. A (dkt. #44-1).)

Apelbaum argues that he entered into an oral agreement with Neely after signing his April 1, 2009 written employment contract changing the terms of the equity element of his compensation package: "This agreement, however, was modified over the course of several conversations between Apelbaum and Neely.  Specifically, this agreement called for a stock award of 50,000 shares valued at approximately $2 per share, to be awarded to Apelbaum contingent upon the successful release of SocialSense 2.0." (Pl.'s Opp'n Br. (dkt. #64) 11.)

Unfortunately for Apelbaum, the *only* support he has offered for this argument is his own, obviously self-serving deposition testimony.  While this oral testimony might be enough to go forward with a trial on his claim under different circumstances, Apelbaum fails to clear two hurdles here, either of which independently compels entry of summary judgment for defendants on his claim to vested, exercisable stock options.

### a.  Lack of binding, oral agreement

First, Apelbaum's deposition testimony, even when read in the light most favorable to his position and drawing all reasonable inferences in his favor, does not support his theory that an oral agreement with Neely modified the stock-portion of his compensation from a stock option award to an outright grant of stock valued at $2.20 per share.  Apelbaum testified that *at the time he signed the contract* he believed the contract

14

provided for an outright award of stock valued at $2.20 per share, not an award of stock options.   When asked for his "understanding of what this equity portion of your employment contract grants you" and while referring to the April 1, 2009 contract, Apelbaum explained:

> A. Well, the way it was communicated to me by Dan [Neely], Dan indicated that upon successful release of SocialSense 2.0 and its commercial realization, i.e., generation of profit, I will be awarded 50,000 shares of the value of approximately $2 something a share.
>
> Q. . . . What I want to know is what is your understanding of what this particular contract provision provides.   Does the contract provision provide you with 50,000 option to purchase--for your purchase?
>
> A.   It doesn't say anything about purchase.   I was--*my understanding when I signed the contract was that I would be given 50,000 options when I start my employment* and the Board will meet and approve those options.
>
> . . .
>
> Q.   Okay.   And your understanding was that you would be given those options without have to pay anything?
>
> A.  That is correct.

(Apelbaum Dep. 170:19-172:10 (emphasis added).)   Indeed, this is the very deposition testimony Apelbaum cites in support of his theory that the award was for an outright grant of stock.

Apelbaum's understanding of the stock award -- at the time he signed his employment contract -- was mistaken.   He was not promised stock; rather, his contract provided for the award of stock *options*, which he was awarded on August 27, 2009. Apelbaum's mistaken belief about the equity provision in his contract does not render

15

the employment contract or the Award ambiguous.  *United States Fire Ins. Co. v. Ace Baking Co.*, 164 Wis. 2d 499, 504, 476 N.W.2d 280, 282 (Ct. App. 1991) (contract not ambiguous merely "because the parties may disagree about its meaning").

In support of his contention that subsequent conversations altered the equity provision in his employment contract, Apelbaum testified to ten conversations that took place from June through September 2009 -- two with Board Members (or suspected Board Members) and eight with Neely -- concerning his stock options.  None of these conversations, however, even arguably constituted a legally-binding agreement to immediately convert his stock option to the terms of an outright grant of stock.  The first nine conversations contain absolutely no promise to convert the stock option award into an outright grant of stock, much less a specific, binding contract to do so, even assuming the individuals involved had the legal authority to bind the corporation.[10]  The last

---

[10] Apelbaum Dep. 180:6-185:2 (conversation with board member or board advisor Larry L. where Larry L. "felt that I should get a larger award because of the successful release and he said that he may communicate to Neely in regard to that"); 185:13-187:6 (conversation with three board members in August who indicated that "the stock had already been awarded previously and they proceeded to question Mr. Neely as to why the award document was not given to me"); 190:3-194:4 (conversation with Neely in May 2009 when Apelbaum "indicated that I still have not received my stock award even though the contract stipulated that the awards will be issued after the March [board] meeting, and Neely "indicated he was working on it" and that "the Board would have to generate a specific document in order to award the stock, and that has not happened yet"); 210:7-212:20 (conversation with Neely at the SocialSense 2.0 party where Neely indicated "[t]hat he was still working on [the stock options] and it was pending a Board meeting," and "that the stock award was tied to some kind of bureaucratic issue with the Board"); 213:20-216:19 (conversation with Neely on road to Chicago the end of June or July where Apelbaum questioned Neely about his award document and Neely "said that the Board meeting has been scheduled but it has been tied to a successful bridge loan that he was working on at that time"); 217:5-218:18 (conversation with Neely on a boat trip in Chicago during a senior management outing during which Neely indicated "that there was again some bureaucratic issues that he needed to address with the Board, but it

16

conversation Apelbaum allegedly had with Neely concerning his stock options occurred on September 10, 2009, the day before Apelbaum's employment was terminated.  In that conversation, Apelbaum contends that Neely told Apelbaum that he would be able to "liquidate" the stock:

> A. . . . [Neely] indicated that the board was about to meet -- well, actually the Board has met and they generated a document, and it was now a formality before he would give me the document. . . . He also indicated that effectively as of next month I will be able to receive my entire package including the stock option.
>
> Q.  And by the entire package, what did that mean?
>
> A. The early delivery bonus, the performance bonus and my 50,000 shares at possibly $2 a share that *I'll be able to liquidate*.
>
> Q.  He said that they would be able to liquidate or he just said that you'll be able to realize the entire package?
>
> A. *I'll be able to liquidate them out*.  So he said the total compensation by the end of September for me would be 140, $130,000.
>
> Q. And he actually gave you a figure?
>
> A. Well, he gave me the breakdown. So he said that the early delivery bonus is going to be around 20, the performance

---

was a done deal"); 219:6-221:14 (conversation with Neely in Chicago hotel lobby in which Neely indicated that "the Board needed to meet, make the decision and issue something of a written document," and that "I was actually going to get a document that was issued to me with actual stock award"); 222:10-224:19 (conversation with Neely in the conference room next to Brian Johnson's office in September about compensation generally during which Neely said that "he wanted to talk to me in further length, and that he said that he had a creative solution to the problem" concerning stock options); 225:7-227:1 (telephone conversation with Neely on September 10, 2009 during which Neely indicated that "the Board has met and they generated a document, and it was now just a formality before he would give me the document").

> bonus will also be around 20 or so, and then close to
> $100,000 for the option. . . .

(Apelbaum Dep. 226:3-227:1 (emphasis added).)

This testimony alone is not sufficient, however, to raise a genuine issue of material fact as to whether Neely changed the terms of the equity provision from an award of stock options into an outright grant of stock. As an initial matter, this testimony does not support a finding that Neely converted the option into an outright grant of stock, even viewed in the light most favorable to Apelbaum, especially given Apelbaum's apparent confusion as to the difference between the issuance of stock option award and outright grant of stock. (*See* Apelbaum Dep. 170:19-172:10.) More importantly, Apelbaum does not claim that Neely said he would be able to immediately liquidate his stock without the options vesting or Apelbaum exercising his options. And even if Neely somehow *intended* to transfer the stock options award into an outright grant of stock, there is no evidence that he did. Finally, and most important given that this is a breach of contract claim, Apelbaum presents no evidence of any consideration on his part, or even that he acted in reliance on Neely's statement, coming as it did the day before his termination.

Indeed, the thrust of Apelbaum's testimony about his stock options seems to be his frustration that the Board failed to issue the stock options at the start of his employment. There is certainly evidence that the Board dragged its feet in issuing the stock. Apelbaum's employment contract indicated that the Board would set the exercise price at its next meeting "tentatively scheduled for April 23, 2009." Apelbaum testified that he repeatedly questioned Neely about the status of the award, and Neely

18

consistently indicated that he was "working on it," but that there were some bureaucratic issues, and that the Board needed to meet and issue the actual award. (*See, supra,* n.10.)

Perhaps Networked Insights originally intended to award the stock options at the commencement of Apelbaum's employment or around that time, rather than four months later in August. For whatever reason, it did not. Even if the Board had awarded the stock on April 23, 2009, or even on April 1, 2009, the date of his employment contract, the stock would still not have vested by the time Apelbaum's employment was terminated. All unvested shares -- regardless of whether Apelbaum was terminated "for Cause" or "for any reason other than Cause" -- are revoked under the plain language of the Award.[11] Moreover, even if the options had vested, it is undisputed Apelbaum took no steps to exercise his options by completing the necessary paperwork or purchasing them by paying Networked Insights the exercise (or purchase) price per share.

### b.  Failure to plead a breach of oral agreement claim

Second, even if a binding, oral agreement existed which changed the terms of the original equity grant set forth in his original, employment contract, Apelbaum did not plead this in his breach of contract claim. Instead, Apelbaum solely and expressly relied on an alleged breach of the written contract:

> 6.  In April of 2009, Apelbaum entered into an employment contract with [Networked Insights] to become [Networked Insights'] Vice President of Technology.

---

[11] The issue of whether Apelbaum was terminated for cause or for any reason other than cause has no bearing on Apelbaum's breach of contract claim and, therefore, is not material to deciding Networked Insights' motion for summary judgment.

. . .

> 8.   Under the contract, [Networked Insights] promised Apelbaum 50,000 stock options in [Networked Insights], which would vest over a period of three years.

> 9.   In September of 2009, Apelbaum was terminated and has not received his prorated share of the bonuses and stock options promised.

(Compl. (dkt. #1-1) ¶¶ 6, 8-9.)

To now claim an alleged breach of a subsequent, oral agreement is a new claim, premised on different facts than those alleged in his complaint.  *See EEOC v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 443 (7th Cir. 2008) (*en banc*) ("The EEOC's complaint gave notice that its ADA claim was grounded on discrimination against Stewart because she was HIV-positive, *not* because she had AIDS.  This was not a mere adjustment in the legal theory of the case . . . ; it was a major alteration of 'what the claim is' and the 'grounds upon which it rests.'")  Apelbaum has not sought amendment of his complaint, nor would it be granted on the eve of trial.  To allow such a claim to continue would violate the fair notice requirement of Federal Rule of Civil Procedure 8.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).[12]

The court does not allow such eleventh hour amendments to preclude the entry of summary judgment.  *See, e.g.*, *Lee's Log Cabin*, 546 F.3d at 443 (finding the district court's refusal to consider the "belated alteration of the factual basis of its claim" at summary judgment "manifestly reasonable"); *Conner v. Ill. Dep't of Natural Res.*, 413 F.3d 675,

---

[12]   For the reasons stated above, the court does not consider Apelbaum's confusing, and at times conflicting, deposition testimony to constitute fair notice of a change in his basic legal theory.

20

679 (7th Cir. 2005) (affirming district court's refusal to consider claim raised for the first time in response to summary judgment brief); *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."); *Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997) (holding that the summary judgment stage "is too late in the day to be adding new claims").

### 2.  Semi-Annual Bonus

Apelbaum's claim of breach of contract for a semi-annual bonus fails for similar reasons.  Apelbaum first argues that Networked Insights was required under the contract to pay a semi-annual bonus.  In so arguing, Apelbaum ignores the language in the contract which states that "[e]ach of these bonuses will be paid out between *0%* and *200%* of the target based on your individual success and company performance." (Johnson Decl., Ex. A (emphasis added).)   By the plain language of the contract, Networked Insights could decide to "award" a bonus of 0% of Apelbaum's target of 15% of his salary.  In other words, it was within Networked Insights' discretion under the plain terms of the contract to award no semi-annual bonus or bonuses.

Apelbaum counters this by arguing that he was promised the maximum bonus of 200% of his target (Apelbaum Dep. 45:7-8) or that he was promised $20,000 (*id.* at 49:19-21).[13]   Apelbaum also offered contradictory statements as to whether the semi-

---

[13] By the court's math, a bonus based on 200% of his target would have been $15,000. Apelbaum's annual salary was $130,000.  On an annual basis, his target (15% of his annual salary) would be $19,500.  Two hundred percent of that target would be $39,000.

annual bonus plan was cancelled in exchange for a higher base compensation scheme. (*Compare id.* at 151:18-25 ("[A]s a management team we decided to eliminate the bonus payment and replace them with cash compensation and higher base pay.") *with id.* at 154:21-25 ("Q: And it's your contention that the semiannual bonus was cancelled for the last half of 2009 for the leadership team at Networked Insights . . . ? A: No.").)

Networked Insights contends that the court should disregard Apelbaum's deposition testimony just as a court would disregard a "sham" affidavit which is inconsistent with a prior sworn statement. *See Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.2d 1162, 1168-69 (7th Cir. 1996). These "sham affidavit" cases seem to be an ill-fit here given that the inconsistent statements all occurred during the course of one sworn statement. Apelbaum's obvious problem is more direct: (1) his own conflicting testimony establishes that there was no enforceable, specific amendment to the semi-annual bonus provisions in his original, written contract; and (2) his argument again relies on an alleged breach of a post-contract, oral agreement which he failed to both plead in his complaint or give fair notice to defendants until the filing of his opposition to defendant's motion for summary judgment.[14]

---

If that amount is prorated based on the length of Apelbaum's employment (20 weeks out of 52 weeks or roughly 38% of the year), the semi-annual bonus (or bonuses on an annual basis) would be $15,000.

[14] While it is true that a subsequent oral agreement can amend a written contract under Wisconsin law, *see Kinzfogl v. Greiner*, 265 Wis. 105, 107-08, 60 N.W.2d 741, 742 (1953), Apelbaum's complaint was not premised on such a claim. Instead, Apelbaum's allegations about the semi-annual bonus in his complaint, like those concerning his equity claim, involve an alleged breach of the April 1, 2009 contract, not a breach of some subsequent, oral agreement. Specifically, Apelbaum alleged:

Apelbaum cannot defeat summary judgment by asserting such a new claim at this late date without unfair prejudice to defendants. *See, e.g., Lee's Log Cabin*, 546 F.3d at 443; *Conner*, 413 F.3d at 679; *Grayson*, 308 F.3d at 817; *Auston*, 116 F.3d at 255.

Like the stock options, it appears that Apelbaum's real complaint is based on confusion over his original contractual rights and Networked Insights delay in making its semi-annual bonus decisions. According to Apelbaum's contract, semi-annual bonus decisions for the first half of 2009 were supposed to be made in July 2009. Instead, Networked Insights' Board did not determine the leadership team's bonuses for 2009 -- for both the first half and the second half -- until February 2010. Apelbaum was no doubt frustrated with this delay. He testifies at his deposition to several conversations with Neely concerning the delay in issuing the semi-annual bonus, along with other compensation issues. This delay is *not*, however, the basis of his breach of contract claim. Even if it were the Board's ultimate decision not to award any semi-annual bonuses for

---

6. In April of 2009, Apelbaum entered into an employment contract with [Networked Insights] to become [Networked Insights'] Vice President of Technology.

7. Under the contract, [Networked Insights] promised Apelbaum two bonuses:

a. A semi-annual bonus based on Apelbaum's individual success and company performance, the first of which was to be distributed in July of 2009; . . .

9. In September of 2009, Apelbaum was terminated and has not received his prorated share of the bonuses and stock options promised.

(Compl. (dkt. #1-1) ¶¶ 6-7, 9.)

2009 to Networked Insights' entire leadership team, shows Apelbaum was not injured in any event.

### 3. Early Delivery Bonus

Unlike the other two bases for his breach of contract claim, Apelbaum has raised a genuine issue of material fact with regard to Networked Insights' alleged failure to pay Apelbaum an early delivery bonus.  Accordingly, the court will allow this claim to go forward to trial.  The April 1, 2009 employment contract provides:

> You are eligible to receive a bonus for successfully leading the development and early delivery of version 2.0 of our SocialSense application.  A $5,000 bonus will be awarded for each month prior to October 2009 that the application is *fully launched against an existing or new client*.

(Johnson Decl., Ex. A (dkt. #44-1) (emphasis added).)  The award of the early delivery bonus depends on the meaning of "fully launched against an existing or new client," and this term is not defined in the employment contract or in any other document, leaving unanswered:  Does the "fully launched" requirement mean that SocialSense 2.0 must be fully completed, as defendant contends, or simply released to a client, as plaintiff contends?

Defendant contends that Apelbaum's failure to migrate to Hadoop during his tenure with Networked Insights renders the development of SocialSense 2.0 incomplete, and therefore Networked Insights did not breach the employment contract by failing to provide Apelbaum with an early delivery bonus.  In so arguing, Networked Insights assumes that the migration to Hadoop was necessary to "fully launch" the application.

24

Assuming its migration has since been completed, Hadoop certainly appears to be part of the completed 2.0 version of SocialSense, but Apelbaum has put forth evidence of sales to clients of version 2.0 during Apelbaum's employment with Networked Insights, before the migration to Hadoop.  Given the ambiguity in the contract as to the meaning of this term and the evidence demonstrating client sales of version 2.0 in the summer of 2009, the court denies defendant's motion for summary judgment on this element of Apelbaum's breach of contract claim.

**B.      Motion for Default Judgment as Discovery Sanction**

In addition to moving for summary judgment, defendant filed a separate motion for default judgment on Networked Insights' counterclaims of civil theft pursuant to Wis. Stat. § 895.446 and conversion as a discovery sanction because of Apelbaum's alleged spoliation of evidence.  Specifically, Networked Insights alleges that Apelbaum used a "Department of Defense-level data erasure software program" on the Hewett Packard laptop computer which is at the center of Networked Insights' counterclaims just two days before Apelbaum produced the computer for inspection.  It certainly appears that Apelbaum's use of the erasure program has rendered it impossible for them to uncover certain evidence, namely (1) documents demonstrating that Apelbaum altered an expense report spreadsheet at issue in this case, and (2) documents and other data demonstrating how Apelbaum had used the computer (*i.e.*, for work or for personal use).  Because of the nature of the alleged abuse, Networked Insights contends that the only appropriate remedy is entry of default judgment.

Networked Insights retained an expert, Gary Haas, to examine the HP laptop. Haas made the following observations:

- "There was only a small number of user created document files such as Microsoft Office documents, Adobe Acrobat filed, internet artifacts, etc.  There was no email data.  I note that this would be highly unusual for a system that is a primary computer used at work or at home." (Declaration of Gary Haas ("Haas Decl.") (dkt. #55) ¶ 10.)

- "It is my opinion, to a reasonable degree of computer forensic certainty, that a data wiping utility called 'R-Wipe & Clean' which is sold by 'R-Tools Technology' was installed and run on the HP Laptop." (*Id.* at ¶ 13.)

- "It is my further opinion, to a reasonably degree of computer forensic certainty, that the appearance of certain portions of the unallocated space on the HP Laptop hard drive are consistent with evidence that the hard drive was "wiped" or overwritten with a random data pattern which makes previously-deleted data unrecoverable from the drive using any software of hardware tools presently available."  (*Id.* at ¶ 21.)

Apelbaum admits that he installed the R-Wipe & Clean Program on the HP laptop at issue, as he maintains is his practice with respect to all computers that he purchases or otherwise controls.  (Affidavit of Jacob Apelbaum ("Apelbaum Aff.") (dkt. #63) ¶¶ 2, 4.)  Apelbaum further attests that he "configured and used the R-Wipe & Clean utility on the HP Laptop *exclusively* to erase and write-over internet-related files, including but not limited to 'tracking cookies', 'spyware', 'addware', and other sensitive financial and personal data stores in 'temp' files."   (*Id.* at ¶ 4 (emphasis added).)

Apelbaum configured the software to perform this operation every time the browser was closed.  (*Id.*)[15]

Apelbaum's statements appear to be entirely consistent with Haas's report. Specifically, Haas's statement that "the hard drive was 'wiped' or overwritten with a random data pattern" -- as the court understands it -- is consistent with Apelbaum's use of R-Wipe & Clean since internet-related files are stored on the hard drive.  Haas's observation that there were only a small number of user-controlled documents might suggest that more than just internet-related files, like internet browsing history and cookies, may have been erased.[16]  The rub is that if Apelbaum were using the program to delete more than just internet browsing history and cookies, there is no way to definitively determine this.

Assuming that Apelbaum simply used the program as he describes, namely to delete internet-related files, the question remains what sanction is appropriate for Apelbaum's glaring failure to turn-off the program to preserve evidence once aware of his dispute with the defendants.  Given Apelbaum's description of how it works -- namely,

---

[15] Apelbaum's affidavit is consistent with Apelbaum's deposition testimony that he uses "a program that deletes content to maintain privacy." (Apelbaum Dep. 80:20-21.)  "The program does not delete e-mails.  It deletes browsing history or some other session history that may expose the computer to an attack from the outside." (*Id.* at 81:2-5.)

[16] Apelbaum testified at his deposition that he owns several computers.  (Apelbaum Dep. 66:15-67:4, 83:14-23.)  In light of this, it might not be surprising that the HP laptop contained so few user-created documents.  Also, Apelbaum attests in his affidavit that he checked his personal web e-mail account on the HP laptop, but any temporary files associated with this web-based email account would have presumably been deleted by the R-Wipe program, and Apelbaum's statement that he used a web-based account may undercut any significance to Haas's statement that the HP laptop lacked any email data.

that it deletes these files anytime the internet browser is closed -- any evidence which may have been useful to Networked Insights, namely evidence that Apelbaum was using the internet for work reasons (*e.g.*, to check a web-based work email account) would have been deleted on an ongoing basis during the course of his employment with Networked Insights or presumably soon thereafter, and well before Apelbaum filed the present lawsuit in December 2009 (three months after his termination), and certainly before Networked Insights filed their counterclaims concerning this HP laptop in April 2010. Of course, by virtue of his failure to turn it off, it appears the court will never know for certain.

For this reason, the court will not impose the ultimate sanction of default judgment without additional evidence of actual spoliation. *See Schmude v. Sheahan*, 420 F.3d 645, 650 (7th Cir. 2005) (instructing district court's to act "with caution and restraint" in sanctioning parties).[17]   Nor, in light of all of this, will the court otherwise

---

[17] The facts here are distinguishable from the facts in the cases cited by defendants where courts have dismissed or entered default judgment against parties that have destroyed evidence.  (*See* Def.'s Br. in Supp. of Default J. (dkt. #52) 18-19.)   For the most part, these cases involve proof -- typically of repeated violations -- of deliberate destruction of evidence.  *See, e.g., Atlantic Recording Corp. v. Howell*, No. CV-06-02076-PHX-NVW, 2008 WL 4080008, at *1 (D. Ariz. Aug. 29, 2008) ("Howell has repeatedly destroyed evidence central to the factual allegations in this case. He admits that he removed the KaZaA program from his computer and deleted the contents of the shared folder shortly after receiving notice of this lawsuit."); *Gutman v. Klein*, No. 03 CV 1570(BMC)(RML), 2008 WL 4682208, at *3-5 (E.D.N.Y. Oct. 15, 2008) (involving sanctioned party admitting to actively deleting and altering documents); *Century ML-Cable Corp. v. Carrillo*, 43 F. Supp. 2d 176, 181 (D.P.R. 1998) (finding that sanctioned party "willfully and intentionally arranged for the destruction of his laptop computer and business records"); *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 109-10 (S.D. Fla. 1987) (finding that sanctioned party "ordered the immediate destruction of documents directly pertaining to Plaintiff's Complaint and Request for Production, on the very day that these papers were served personally upon him").

sanction Apelbaum for the alleged spoliation of evidence at this time.   Networked Insights may introduce additional evidence at trial regarding spoliation -- in particular, additional evidence or clarification from Haas of the extent of hard drive wiping, especially if the court misunderstood any aspect of Haas's report.   If Networked Insights has evidence that documents beyond internet-related files were deleted from the HP laptop, the court will   reconsider Networked Insights' request for sanctions, along with those that may be appropriate for his last-minute, at best ham-handed, production of documents from his cell phone card in a way that apparently destroyed all meta-data.

## ORDER

IT IS ORDERED that:

1) defendant Networked Insights, Inc.'s motion for partial summary judgment (dkt. # 37) is GRANTED IN PART AND DENIED IN PART; and

2) defendant-counterclaimant Networked Insights, Inc.'s motion for default judgment as discovery sanction (dkt. # 51) is DENIED at this time;

3) entry of formal judgment on settled claims (dkt. #81) will await the upcoming trial.

Entered this 25th day of January, 2011.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge